In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3257

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ARNOLD BREWER,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:07-cr-00123-RLM-1—**Robert L. Miller, Jr.**, *Chief Judge*.

ARGUED JANUARY 27, 2009—DECIDED APRIL 2, 2009

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant appeals from his conviction for illegal possession of a gun, for which he was sentenced to six years in prison. The only question presented by his appeal is whether he was stopped without reasonable suspicion, for it was in the course of the stop that the gun was discovered.

It was 2:30 a.m. when a South Bend police officer named Tutino was told by the dispatcher that there was a fight at the Beacon Heights apartment complex, a group

of some 30-odd buildings renowned for criminality—shots are fired there three or four times a week. As Tutino, parked near the complex because of its being a frequent site of crime, prepared to respond to the dispatch, he heard a popping sound that he believed was gunfire coming from the complex. Within minutes he was told by the dispatcher that indeed shots had been fired. Driving toward the complex on the only street by which one can enter or leave it, Tutino was passed by a white SUV coming from the opposite direction. It was—unsurprisingly given the hour—the only vehicle on the road. He radioed to other officers to watch for the white SUV.

When Tutino reached the complex, bystanders told him about the shots and that they had been fired from a white SUV. He radioed the information to his dispatcher, but by the time the information was received and transmitted another police officer had stopped the SUV, which was driven by the defendant. The officer asked the defendant whether he had a gun, and he admitted that he had two, one in the car and one on his person. Still other firearms were found in the car, though there is no evidence that the shots heard by Tutino and others came from any of the defendant's weapons.

Since the stop was made before the officer who made the stop learned that someone in the Beacon Heights apartment complex had said that the shots had been fired from a car that matched the defendant's, that report cannot be used to justify the stop. "The reasonableness of official suspicion must be measured by what the

officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000); *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Without that report, the case is on the line between reasonable suspicion and pure hunch, but we think that in the unusual circumstances presented it meets the test for reasonable suspicion.

It was a natural surmise that whoever fired the shots had left the complex, and the street that the defendant's vehicle was driving on was as we said the only street leading from it, and he was driving away from rather than towards it. The hour reinforced the suspicion, since few people are on the road at 2:30 a.m. and, sure enough, there was no other traffic. Tutino and other officers were about to enter the complex, and if the gunman was not the driver of the white SUV he was still in the complex—armed and dangerous. It behooved each member of the police team to obtain for his own safety and that of the other officers as much information about the situation in the complex as he could before they entered it in the dark. The only vehicle leaving it might have been driven by an entirely innocent person who nevertheless had valuable information.

It is unexceptionable for a police officer to approach a bystander on the street and ask him whether he knows anything about some matter that the officer is investigating. The bystander doesn't have to answer the officer's questions—he can turn on his heels and walk away—but accosting an unsuspected bystander to ask him a question does not violate the Fourth Amendment. *United States v. Drayton*, 536 U.S. 194, 200 (2002). This is

true even though as a practical matter the approach of the police officer will usually cause the person accosted by him to stop walking. *United States v. Broomfield*, 417 F.3d 654, 656 (7th Cir. 2005).

The issue is more complicated when the officer wants to stop a car to ask the driver or passengers something. Such a stop is a greater intrusion on freedom of movement and peace of mind than when a pedestrian is accosted by a police officer on the sidewalk. Still, such stops are permitted when the circumstances justifying the creation of a roadblock are present. See, e.g., *City of Indianapolis v. Edmond*, 531 U.S. 32, 41, 44 (2000); *United States v. O'Mara*, 963 F.2d 1288, 1291-92 (9th Cir. 1992) overruled on other grounds by *United States v. Gergen,* 172 F.3d 719, 722 (9th Cir. 1999); *State v. Gascon*, 812 P.2d 239, 241 (Idaho 1991); *State v. Claussen*, 522 N.W.2d 196, 199 (S. Dak. 1994). And the Supreme Court in *Illinois v. Lidster*, 540 U.S. 419, 424 (2004), upheld a roadblock designed not to intercept the criminal (a driver who had been involved in a hit and run accident a week earlier) but to question persons who traveled on the same road and may therefore have observed the crime. See also *State v. Gorneault*, 918 A.2d 1207, 1209 (Maine 2007); *Burns v. Commonwealth*, 541 S.E.2d 872, 883-84 (Va. 2001). The Court said in *Lidster* that "it would seem anomalous were the law (1) ordinarily to allow police freely to seek the voluntary cooperation of pedestrians but (2) ordinarily to forbid police to seek similar voluntary cooperation from motorists." 540 U.S. at 426; see also *United States v. Goodwin*, 449 F.3d 766, 769-70 (7th Cir. 2006); *United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006).

The government in this case does not seek to justify the stop of the car on the rationale of the roadblock cases. Neither party mentions those cases, and we take note of the Supreme Court's observation in *Delaware v. Prouse*, 440 U.S. 648, 657 (1979), that in encountering a road-block "the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." That was not true here. But it is pertinent to note that, as in *Lidster*, the police in this case had a compelling reason to ask questions of the driver or passenger of the sole vehicle departing from a building complex in which shots had been fired (and not for the first time), in order to protect the police officers who were about to enter the complex. And the natural first question to ask the driver was whether he had a gun, since he might be the gunman rather than a witness.

This case is thus remote from the "standardless and unconstrained" police conduct at issue in *Delaware v. Prouse, supra*, where the Supreme Court forbade the practice of randomly stopping drivers to check their driving license and automobile registration when there was no reason to suspect the driver of having violated any traffic ordinance or other law. 440 U.S. at 661. Officer Tutino was not acting randomly in deciding that the only car emerging from the apartment complex moments after he heard shots from within it should be intercepted. He could not count on being able to do that himself, because he was alone, so he radioed another officer to ensure that the drivers of any vehicles leaving the apartment complex immediately after the shooting would be

stopped and questioned, and this was easily effectuated because there was only one exit from the scene of the crime.

Tutino had three years' experience with criminal activity in the particular housing complex, was parked in a position in which he had an unobstructed view of the only exit from the complex, heard gunfire, received confirmation of a report of shots fired, and saw a vehicle emerge seconds later from the complex. That vehicle—the white SUV—was the only vehicle on the road at that late hour in this high crime area, and it was pulled over and stopped for only moments before the officers making the stop learned that the SUV had been seen at the site of the shooting and that the occupants may have been involved in the shooting. Less than a minute later the defendant admitted that he had guns in the car. When we consider the dangerousness of the crime, the brevity of the interval between the firing of the shots and the spotting of the sole vehicle quickly exiting, the minimal intrusion on the occupants of the vehicle, the need of the police to inform themselves of the conditions in the complex before endangering themselves by entering it in the dark, and the further need to stop potentially fleeing suspects until more information about the crime could be obtained, we conclude that the police acted reasonably, and therefore that the judgment must be

AFFIRMED.