In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3656

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DANIEL L. BOHMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:10-cr-00038—**William M. Conley**, *Chief Judge.*

ARGUED APRIL 13, 2011—DECIDED JUNE 28, 2012

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The question presented in this appeal is whether the police may stop a vehicle only because it emerged from a site suspected of drug activity. Appellant Daniel Bohman raised this question in a motion to suppress evidence discovered when the car he was driving on August 18, 2009, was stopped leaving what turned out to be an active meth lab. His motion was denied after a hearing conducted by a magis-

trate judge and review by a district judge on a report and recommendation. Bohman preserved his objection to the adverse ruling through a conditional guilty plea pursuant to Fed. R. Crim. P. 11(a)(2). So we consider the evidence presented below.

The investigation began with information provided by a man named Ed Olmsted who was arrested in Marathon County, Wisconsin for possessing an anhydrous ammonia tank and wanted to "snitch in exchange for consideration on his charges." *United States v. Barttelt*, No. 10-cr-38-wmc, 2010 WL 3363247, at *1 (W.D. Wis. July 12, 2010). Olmsted's offer piqued the interest of Sgt. Brian Kingsley of the nearby Lincoln County, Wisconsin Sheriff's Department because Kingsley credited another trusted investigator's endorsement of Olmsted's reliability. Olmsted met with Kingsley and told him that he saw known meth cook Jack Barttelt brew meth three times in the past two months at a hunting cabin on "Big Tony's" property. Olmsted identified a rural forty-acre parcel owned by Tony Thorenson in a plat book and also told Kingsley that (1) he had seen an anhydrous ammonia tank at the cabin within the last week or so; (2) that a locked cable blocked the drive leading to the Thorenson cabin; and (3) that Barttelt drove a green Mercury Grand Marquis.

Kingsley's 17-plus years with the department, his 40-or-so meth lab busts, and his training and experience qualify him as a veteran meth investigator. With a sniff he can distinguish between household ammonia (often diluted in cleaners) and anhydrous ammonia (used legiti-

mately as a fertilizer but also in cooking meth) because of the latter's noticeably more pungent odor and the burning sensation it causes in his mouth and nose. Based on his experience, Kingsley thought he would find evidence of a meth lab at the cabin in one of three phases because meth cooks do not tend to store anhydrous ammonia for more than a week or so: (1) precooking (gathering ingredients, paraphernalia); (2) cooking; or (3) post-cooking (glassware, filters, starter fluid cans, lithium battery strips, and so on).

Sgt. Kingsley drove to the Thorenson property shortly after his evening interview with Olmsted, arriving at about 11 p.m. Another officer rode along but only Kingsley testified at the suppression hearing. Kingsley testified that he found a locked cable blocking a driveway just as Olmsted described. About 300 yards through the woods, he saw a cabin and a light. As he prepared his surveillance gear, Kingsley inadvertently beeped his horn. Vehicle lights came on near the cabin and started down the drive toward the cabled gate. Kingsley quickly backed his squad car westward away from the driveway with his lights off. Kingsley saw the vehicle stop at the cable for about twenty to thirty seconds and then back up the driveway to the cabin's vicinity. Kingsley testified that the vehicle's movement caused him to be "very surprised" and seemed unusual to him because he thought that if someone were checking on a car honk they would have come onto the road and possibly a little farther rather than just stopping at the gate. About five minutes later, after he had repositioned his car to the east of the driveway, Kingsley observed a second incident of a vehicle

driving up to the cable. This time, like before, the vehicle stopped at the cable, but unlike earlier, it emerged out of the driveway about twenty seconds later, driving toward Kingsley's position. Kingsley flipped on his police lights and pulled in front of the approaching car, which stopped immediately. Kingsley frankly conceded that he did not observe any traffic violations before the stop. At some point it became clear that the stopped car was not a green Grand Marquis but was instead a reddish-maroon Chevrolet Beretta coupe. Kingsley did not testify that the vehicle that came down the driveway either time appeared to be a Grand Marquis, or even that it appeared to be the same vehicle both times. Kingsley said that all he could tell about the car before he stopped it was that it was a vehicle with two headlights.

Kingsley and his colleague got out of their car and walked toward the stopped vehicle. As soon as Kingsley could see into the car, he recognized the driver as Daniel Bohman but did not recognize the passenger. Both complied with Kingsley's request to step out of the Beretta. As Kingsley questioned the passenger, who identified himself as Jake Barttelt, he smelled the distinctive odor of anhydrous ammonia. Barttelt claimed he had been bear hunting, but that sounded unlikely to Kingsley because of Barttelt's attire (shorts, tennis shoes, and socks, but no shirt) and the time of night. Kingsley concluded that he had uncovered a meth cook site. Backup arrived and police placed Bohman and Barttelt into different squad cars. Kingsley asked Bohman about a meth cook and Bohman answered affirmatively and indicated that Barttelt was cooking.

A search of the cabin (authorized by a subsequently issued warrant, based in part on information learned during the vehicle stop) confirmed that it was indeed a lab, but the particulars are not relevant to the issue before us. Bohman doesn't dispute that a justifiable stop of his car would permit his removal from the car, and properly so. *E.g.*, *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) (officers may order drivers to exit their vehicles during investigatory stops). And he essentially concedes that once Kingsley sniffed anhydrous ammonia, to say nothing of Bohman's admission, there was probable cause to search the cabin. Instead, Bohman maintains that if the stop was unreasonable, then anything obtained during the stop should be suppressed and the cabin search would be fruit from that poisonous tree. The district court found that Kingsley had reasonable suspicion that there was or recently had been meth cooking at the cabin, *United States v. Barttelt*, No. 10-cr-38-wmc, 2010 WL 3363307, at *5 (W.D. Wis. Aug. 23, 2010), but it noted that finding reasonable suspicion for stopping the car was a "closer call" and a "debatable point," *id.* at *5-*7. Yet the court found that Olmsted's corroborated information and the "suspicious behavior" in response to the horn honk justified moving the suspicion regarding the car from "beyond a hunch to at least minimal suspicion." *Id.* at *6-*7. Alternatively, the court found that even if the stop was unreasonable, the determination's closeness justified concluding that any error was merely negligent and that Kingsley acted in good faith—that is, his conduct did not justify exclusion. *Id.* at *7.

A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property. *See United States v. Johnson*, 170 F.3d 708, 720 (7th Cir. 1999). The Fourth Amendment allows officers to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). This reasonableness standard typically requires a set of facts that we can measure against an objective standard such as "probable cause or a less stringent test" such as reasonable suspicion. *Delaware v. Prouse*, 440 U.S. 648, 654 & n.11 (1979) (internal footnotes omitted). In those circumstances where we do not insist on "some quantum of individualized suspicion," we rely on other safeguards to assure that the reasonable expectation of privacy is not "subject to the discretion of the official in the field." *Id.* at 654-55 (quoting *Camara v. Mun. Court*, 387 U.S. 523, 532 (1967)). For instance, an officer with a warrant to search a place may stop anyone leaving that place without additional individualized suspicion, *see Michigan v. Summers*, 452 U.S. 692, 702-03 & n.16 (1981), but a mere suspicion of illegal activity about a place, without more, is not enough to justify stopping everyone emerging from that property, *see Johnson*, 170 F.3d at 720.

When Sgt. Kingsley stopped Bohman's Beretta, everything informant Olmsted said had checked out, but the government does not attempt to justify the vehicle stop on the basis that Kingsley had accumulated probable cause that the cabin housed a meth cook. Kingsley still had a

few critical things to confirm: the presence of an anhydrous ammonia tank, suspected cook Jake Barttelt, and, of course, his green Grand Marquis. So we agree with the district judge that Kingsley needed something extra to move the justification for the stop from "a hunch to at least minimal suspicion." 2010 WL 3363307, at *7. The response to the horn honk doesn't move the suspicion on the Beretta beyond a hunch but for a different reason than Bohman argues. Bohman's alternative, innocent explanation for the reaction to the horn honk (the equivalent of a doorbell ring in this rural environment) doesn't undercut the reasonableness of Kingsley's surprised reaction or his belief that the behavior was "unusual." *See, e.g., United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) (behavior "susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors"); *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008) (seemingly innocent behavior suggested "something was rotten in Denmark when [a] car sped up a bit"). Yet as surprising as this behavior may have been, it does not on its own lend a suspicion of something illegal or wrong as to the Beretta. It didn't give Kingsley anything to add to his existing suspicion that the activity at the cabin might involve an anhydrous ammonia tank, Jake Barttelt, and a green Grand Marquis. So when Kingsley stopped the car he did so because it emerged from a forty-acre tract containing a suspected meth cook site.

In *Johnson*, we concluded that police are not entitled to detain just anyone who walks out of an apartment

generally suspected of hosting illegal activity. 170 F.3d at 719-20. The police did not suspect anyone in particular of criminal activity. *Id.* Yet the police still detained the first person who happened to walk out of the suspected apartment. *Id.* at 711. Bohman's case is indistinguishable (and, surprisingly, the government ignores it in its briefing). Like the officers in *Johnson*, Kingsley suspected that a particular place housed drug activity. And like in *Johnson*, he stopped the first person that emerged. The principal difference between this case and *Johnson* is an immaterial one: in this case, Sgt. Kingsley comported himself unobjectionably and professionally (attempting to conduct covert surveillance from public property) as opposed to *Johnson*, which involved "knock and talk" techniques that opened the officers' conduct to criticism. *See id.* at 721 (Evans, J., concurring) (seeds of bad search "sown when the police decided to use the 'knock and talk'" shortcut).

The government's attempt to justify the stop based on reasonable suspicion despite the lack of *particular* suspicion about the car actually stopped ignores that the Supreme Court has only allowed such stops in narrow circumstances. Namely, when the police have a warrant to search a house, the detention of individuals found leaving that house is constitutionally reasonable because of "the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant." *Summers*, 452 U.S. at 703. The impending warrant-authorized search of the home means that the detention, although a meaningful restraint on liberty, "was surely less

intrusive than the search itself," *id.* at 701, and "represents only an incremental intrusion on personal liberty," *id.* at 703. But in this case there was no warrant and the reasoning of *Summers* can't be stretched to cover a case like this which involves, at most, reasonable suspicion.

Moreover, there is also no suggestion that the Beretta posed any danger to anyone. Unlike the officer in *United States v. Brewer*, Sgt. Kingsley didn't hear or receive reports of an ongoing danger such as gunshots. 561 F.3d 676, 678 (7th Cir. 2009). In *Brewer*, as an officer prepared to respond to a report of a fight at a notorious apartment complex, he heard something that sounded like gunfire coming from the complex. *Id.* at 677. Within minutes, a dispatcher told him that shots had been fired and as he drove toward the complex via its only access point a car passed him going the other direction. *Id.* On those facts, very different from this case, we found that "the case is on the line between reasonable suspicion and pure hunch" but given the unusual circumstances—the single access point, the timing of the car's departure from the complex related to the shots fired, the lateness of the hour and lack of traffic, and importantly, the situation's dangerous nature—we found that reasonable suspicion justified the stop. *Id.* at 678. Those are differences that matter. The stop in this case was on the other side of the line; it was based on a hunch.[1]

---

[1] This case seems unusual because, as we noted earlier, Kingsley did not observe the Beretta navigate the road in a

(continued...)

In certain circumstances, the Fourth Amendment permits checkpoint stops as reasonable intrusions on individuals' rights but only if the police satisfy a balancing test set forth in *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990). But police cannot simply pull over all vehicles on a certain road in hopes of finding violators. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 35-36, 48 (checkpoint for "the general interest in crime control" violated the Fourth Amendment). Of course, the government doesn't justify the stop of Bohman's Beretta as a permissible checkpoint. But the purported basis of the stop—a suspicion about a place and some surprising behavior a few minutes earlier—would essentially allow

---

[1] (...continued)

curious (let alone illegal) manner. *Cf. United States v. Burton*, 441 F.3d 509, 512-13 (7th Cir. 2006) (drug-house tip, defendant's emergence from adjacent house, and position assumed in street causing cars to swerve was "minimal suspicion" needed for "a minimal stop"). Kingsley simply stopped a car he knew nothing about other than its emergence from a suspected meth cook site. *Cf. United States v. Bullock*, 632 F.3d 1004, 1013 (7th Cir. 2011) (confirmed tip plus "behavior consistent with a drug courier or distributor"); *United States v. Booker*, 579 F.3d 835, 837-39 (7th Cir. 2009) (informant pointed out car); *United States v. Rodriguez*, 831 F.2d 162, 165 (7th Cir. 1987) (reasonable to suspect visitor from Florida came to Indiana to further drug distribution conspiracy after seeing him meet with suspected conspiracy members). And a stop resting on the mere emergence from a suspected drug site violates the prohibition against stops based on nothing more than generalized suspicions. *See Johnson*, 170 F.3d at 719-20.

the government to set up checkpoint stops outside suspected drug production or distribution sites to detect "ordinary criminal wrongdoing." *Id.* at 41.

Perhaps recognizing its shaky position, the government argues in the alternative that even if Kingsley lacked reasonable suspicion to justify the stop, that error was merely negligent and did not warrant suppression. The district court characterized Kingsley's decision as close and that any error under these circumstances was "no more than negligence" because Kingsley made "a good faith attempt to" investigate lawfully under *Herring v. United States*, 555 U.S. 135, 143 (2009). 2010 WL 3363307, at *7. We don't doubt Kingsley's good faith efforts. But the government doesn't point to a single case where the good faith exception applied to a lack of reasonable suspicion and we don't think it does. As we recognized in another context, "removing this sort of police misconduct from the ambit of the exclusionary rule would have significant implications: it would eliminate the rule's deterrent effect on" unreasonable seizures. *United States v. Burgard*, 675 F.3d 1029, 1035 (7th Cir. 2012), *petition for cert. filed* (May 31, 2012) (No. 11-10613). Contrary than to the district court's conclusion, stopping a car just to identify its occupants is deliberate enough to justify suppression when "there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law." *Prouse*, 440 U.S. at 650. Although the circum-

stances may have supported a general suspicion about the Beretta, because Kingsley lacked that "quantum of individualized, articulable suspicion," *id.* at 662, the evidence from the stop must be suppressed.

The parties dispute whether Bohman had a sufficient interest in the cabin area to allow him to seek suppression of the evidence discovered there, *see Rakas v. Illinois*, 439 U.S. 128 (1978); *Alderman v. United States*, 394 U.S. 165 (1969), and the extent of the taint that should result from the stop, *see Brown v. Illinois*, 422 U.S. 590 (1975); *Wong Sun v. United States*, 371 U.S. 471 (1963). The district court did not need to reach these arguments and the magistrate judge focused the evidentiary hearing on the stop's validity. We leave the issues of the sufficiency of Bohman's interest in the cabin and the extent of the taint for the district court to address in the first instance if Bohman withdraws his guilty plea and seeks to suppress evidence acquired at the cabin on remand. We REVERSE the district court's denial of Bohman's motion to suppress and REMAND for further proceedings consistent with this opinion.