In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3571

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRANDON BURGESS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 890-1 — **Edmond E. Chang**, *Judge.*

ARGUED JUNE 10, 2014 — DECIDED JULY 17, 2014

Before BAUER, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Brandon Burgess was indicted for possessing a firearm as a convicted felon. *See* 18 U.S.C. § 922(g)(1). He moved to suppress the gun, which police officers found after stopping a car that he was riding in, arguing that the officers lacked reasonable suspicion to justify the stop. The district court denied his motion, and Burgess preserved his challenge—the only one he raises on ap-

peal—with a conditional plea of guilty. *See* FED. R. CRIM. P. 11(a)(2).

There was some confusion in the testimony given by the police officers at the suppression hearing, which we will discuss below, but the facts as determined by the district judge are not disputed on appeal. The court found that late on a Sunday night (around 10:45 p.m.) in October 2011, gunshots were fired in a neighborhood on Chicago's northwest side. Numerous 911 callers reported gunshots in the area. The number of shots fired varied from 5 to 9, and one dispatch reported that they came from a large caliber gun. Based on these reports, a dispatcher told nearby police officers to check two locations (the intersections at Wabansia and Karlov Avenues and at Armitage and Kildare Avenues) that are roughly a half-mile apart. Less than two minutes later, based on additional calls, the dispatcher added that shots were fired from a black car traveling south on Karlov near Wabansia.

Immediately responding to the dispatches, two officers in a patrol car approached the area identified by the dispatcher as they drove south on Kostner Avenue, a street parallel to and just a few streets west of Karlov. Traffic was light. They passed a black car headed north, and making a U-turn, the officers stopped the car about a half-mile from Armitage and Kildare and a mile from Wabansia and Karlov. Burgess was a passenger in that car (even though he was merely a passenger in the vehicle, for simplicity hereafter, we will refer to it as his car), and the officers found a revolver on his seat, five of its six rounds spent. Just over four minutes had passed from the initial dispatch about gunshots to the officers' report that Burgess was in custody.

Based on these facts and his 2001 conviction for second-degree murder, Burgess was indicted under § 922(g)(1) for possessing the gun as a convicted felon. He moved to suppress evidence about the revolver on the theory that the police officers lacked reasonable suspicion to justify stopping the car. The district court held an evidentiary hearing to resolve factual disputes about what the police officers knew before conducting the stop. The court received the recorded radio transmissions from the dispatcher and the testimony of the arresting officers. The officers testified that they recognized Burgess and the driver as gang members, that Burgess made furtive movements both before and after they initiated the stop, and that the dispatcher described the black car as big, with two doors and two occupants. As noted above, though, there was some inconsistency between this portion of the officers' testimony and other evidence which caused the judge to reject the officers' testimony regarding recognition of Burgess, the furtive movements and the description of the size of the car and the number of its doors and occupants. The court did not reach a conclusion as to whether the inconsistencies were the result of faulty memory, nervousness, lack of preparation or some other reason. Nevertheless, the court denied the motion to suppress. It ruled that, based on what the officers observed regarding the lightness of traffic at that hour and what they knew from hearing the dispatches alone—the car's color, the "close proximity to the report of shots fired both in terms of timing and location," and the seriousness of the reported crime—reasonable suspicion justified the stop.

On appeal, Burgess does not dispute the district court's findings about what the officers actually knew prior to the

stop, but he contests that their knowledge was enough for reasonable suspicion, a legal conclusion that we review de novo. *See United States v. Henderson*, 748 F.3d 788, 790 (7th Cir. 2014); *United States v. Riney*, 742 F.3d 785, 787 (7th Cir. 2014). His contentions boil down to two arguments.

First, he says that the police officers didn't themselves witness the shooting or know if the "hearsay information" they received from the dispatcher was reliable. This argument is meritless. Over the course of a few minutes, numerous 911 callers independently reported gunshots in the same area. Corroboration from multiple sources describing the general area and nature of the same crime exceeds the single police tip that alone can supply reasonable suspicion for a stop. *See Florida v. J.L.*, 529 U.S. 266, 270–71 (2000) (holding that single tip from anonymous source may establish reasonable suspicion if exhibits "moderate indicia of reliability").

Second, and more significantly, Burgess maintains that the officers acted on "nothing other than a hunch … based solely upon the fact that the car was black in color" when they stopped his car a mile from a reported shooting. He emphasizes that many cars in Chicago are black; that the shooter's car could have left the area on many streets; and that callers reported that the shooter's car had been traveling south when shots were fired, yet Burgess's car was traveling north when the officers stopped it. These facts, Burgess says, makes his case similar to *United States v. Bohman*, 683 F.3d 861 (7th Cir. 2012), in which police officers stopped a car solely because it left an area where the officers suspected drug activity. We ruled that the stop was unreasonable in that case, explaining that "a mere suspicion of illegal activity about a place, without more, is not

enough to justify stopping everyone emerging from that property." *Id.* at 864; *see also United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999) (holding that mere generalized tips about drug activity are not enough to support stopping anyone leaving the area). The officers in *Bohman* had no particularized suspicion about the involvement of that vehicle or its occupants in criminal activity prior to the stop.

But the officers in this case had more to go on than merely observing Burgess's car leave an area suspected of illegal activity. We evaluate reasonableness based on the "totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011), and a number of circumstances, beyond mere proximity to a suspected crime, separate Burgess's case from *Bohman* and *Johnson*.

At the outset we observe the dangerousness of the situation facing the officers and the public. *See United States v. Goodwin*, 449 F.3d 766, 769, 771 (2006) (applying sliding scale approach under which greater danger requires less suspicion for reasonable search). We emphasized in *Bohman*, 683 F.3d at 866, that the apparent lack of immediate danger in that case set it apart from *United States v. Brewer*, 561 F.3d 676, 677–79 (7th Cir. 2009), in which we ruled that an officer reasonably stopped the first vehicle to drive out of an apartment complex given the short amount of time between a reported shooting and the vehicle's departure. But the imminent danger in this case makes it like *Brewer*, not *Bohman*. Multiple callers reported shots fired in the same general area, creating heightened

suspicion of a serious crime, and for all the officers knew as they approached the area just minutes later, more than one shooting location was involved. The threat to public safety was serious, and the officers had to assume that it was continuing in process.

Against the background of this ongoing threat, a number of considerations supported stopping Burgess's car in particular. Some of the callers reported that the shots were fired from a black car on Karlov near Wabansia, so the officers had both a specific car color and a street location to zero in on. Two or three minutes later the officers saw a black car pass them (going the other way and out of the area) on a street parallel to and just a few streets over from Karlov—about a mile from Karlov and Wabansia, a distance and on a street one might reasonably expect the shooter's vehicle to have traveled during the time that had elapsed. And because of the light traffic late on that Sunday night, there was a good chance that seeing Burgess's car at that time and place was more than a coincidence. That probability wasn't lessened by the fact that the car was headed in the opposite direction as the vehicle identified in the dispatch, for it is hardly surprising that a car involved in a drive-by shooting might change directions afterwards, perhaps to return to where it originated prior to the shooting.

All told, the circumstances here—the dangerousness of the crime, the short lapse of time between the dispatches and the stop, the stop's proximity to the reported shots, the car's color, and the light traffic late at night—provided ample justification for stopping Burgess's car. In such a situation, it is reasonable for police to act quickly lest they lose the only opportunity they may have to solve a recent violent crime or to interrupt an

advancing one. After all, reasonable, articulable, particularized suspicion is not a matter of certainty, and recent reports of large caliber gunshots fired from a black car in a densely populated urban area added up to enough to permit a stop of this car to allow for further investigation.

AFFIRMED.