In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2054

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRILL A. RICKMON, SR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 18-cr-10046 — **James E. Shadid**, *District Judge.*

ARGUED FEBRUARY 19, 2020 — DECIDED MARCH 11, 2020

Before WOOD, *Chief Judge*, and FLAUM and RIPPLE, *Circuit
Judges*.

FLAUM, *Circuit Judge*. One hundred police departments use
a surveillance network of GPS-enabled acoustic sensors called
ShotSpotter to identify gunfire, quickly triangulate its loca-
tion, and then direct officers to it. As a matter of first impres-
sion, this case requires us to consider whether law enforce-
ment may constitutionally stop a vehicle because, among
other articulable facts, it was emerging from the source of a

ShotSpotter alert. The district court held that the totality of the circumstances provided the officer responding to the scene with reasonable suspicion of criminal activity to justify the stop. We affirm.

## I. Background

ShotSpotter is a surveillance system that uses sophisticated microphones to record gunshots in a specific area. After a device detects the sound of gunfire, it relays the audio file to a server in California, where an individual determines whether the sound is a shot. When that individual confirms the sound is a gunshot, ShotSpotter sends it back to the local police department.

In the very early morning of July 29, 2018, Travis Ellefritz—an officer with the Peoria Police Department—was patrolling the city in his squad car. At 4:40:02 a.m., the Department's ShotSpotter system reported two gunshots coming from 2203 North Ellis Street. When Officer Ellefritz received the ShotSpotter alert on his computer, he immediately started driving toward the 2200 block of North Ellis. On his way, Officer Ellefritz heard the police dispatcher broadcast the ShotSpotter alert he had just received. He then heard the dispatcher report a second ShotSpotter alert of three more shots fired.

Additionally, the dispatcher stated: "Cars en route to Ellis. There are several cars leaving but seen going northbound on McClure." The dispatcher also reported a "black male on foot who ran northbound on McClure." As Officer Ellefritz approached the location, he switched his car lights off, turning left from McClure Avenue onto North Ellis Street. He was the first officer at the scene. Shortly thereafter, Officer Ellefritz

saw a car's headlights down the road and noticed it was leaving North Ellis to come his way. This was the only vehicle Officer Ellefritz observed on the street.

Upon seeing the headlights, Officer Ellefritz activated his emergency lights and veered his vehicle into the lane of oncoming traffic. As the approaching car slowed, Officer Ellefritz feared for a second that it was trying to get away from him, so he shouted "stop" as he exited his vehicle at 4:45:23 a.m. Within seconds of this command, the car stopped next to the left bumper of Officer Ellefritz's cruiser.[1] The car's occupants pointed backward, in the direction from where they came, yelling: "They are down there! They are down there!" Officer Ellefritz looked that way and observed a crowd of about 15–20 people at the street's dead end, approximately 300 feet from him.

Officer Ellefritz kept his firearm drawn. He saw the defendant, Terrill Rickmon, in the passenger seat. The driver was the owner of the car. Both men kept their hands up until backup arrived. At that time, Rickmon informed the officers that someone had shot him in the leg. (Obviously, Officer Ellefritz did not know Rickmon was wounded when Ellefritz originally stopped the car.) With the driver's consent, Officer Ellefritz searched the automobile and found a nine-millimeter handgun under the passenger seat where Rickmon had been sitting.

---

[1] The other car subsequently rolled back a few feet to a complete halt. Because this occurred after Officer Ellefritz already commanded the stop, it does not factor into our analysis.

Because of his criminal history, a federal grand jury indicted Rickmon for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Rickmon moved *pro se* to suppress the firearm found by Officer Ellefritz, contending that the Peoria Police Department did not have records showing how many ShotSpotter reports were "false positive[s]" and that other systems in cities across the country were inaccurate and unreliable.

On December 21, 2018, the district court presided over an evidentiary hearing regarding Rickmon's motion to suppress.[2] Officer Ellefritz testified that, before the stop, he had

---

[2] At certain points in this case, Rickmon has somewhat taken issue with ShotSpotter's reliability. A police department witness testified that, in general, SpotShotter validates whether a sound is a gunshot within seconds; however, in these specific circumstances, the witness was unable to say how long that process took. The district court also received evidence that SpotShotter is not always accurate and that officers may not solely rely on it to locate gunfire. As Rickmon points out, the record here does not demonstrate how often the Peoria Police Department received incorrect ShotSpotter reports or anything else attesting to the reliability of the system. Still, the witness was subject to cross-examination about ShotSpotter's reliability. *See Florida v. Harris*, 568 U.S. 237, 247 (2013) (observing that a defendant can challenge the reliability of certain evidence during cross-examination); *United States v. Bonds*, 922 F.3d 343, 345–46 (7th Cir. 2019) (similar). Rickmon, for his part, declined to further challenge ShotSpotter's adequacy. *Cf. Harris*, 568 U.S. at 248–49 (forfeiting similar argument). We therefore take his argument as based on reasonable suspicion and need not reach the reliability of ShotSpotter. In some future decision, we may have to determine ShotSpotter's reliability where a single alert turns out to be the only articulable fact in the totality of the circumstances. *See, e.g.*, *State v. Hill*, 851 N.W.2d 670, 691 (Neb. 2014) (holding that ShotSpotter technology is reliable). But, in any event, this is not that case, given that 911 calls corroborated the ShotSpotter reports here and Rickmon himself

no idea how many people were in the car or who was in the car. Furthermore, he stated that he had no reason to suspect that any weapons used in the shooting were in this car. He explained that the occupants were not attempting to flee, they complied with his commands, and they neither moved suspiciously nor gestured threateningly. In sum, there was nothing particularly unusual about this car, except for the fact that it was leaving the area of the gunfire.

Following the hearing, the district court denied Rickmon's motion, ruling that the traffic stop was objectively reasonable based on the totality of the circumstances. The court reasoned:

> The short lapse of time between the dispatch and the stop, the 911 call of vehicles leaving the area, this vehicle being the only one Ellefritz saw in close proximity, less than 300 feet from where the shots were reported to have come from, the vehicle driving away from the area where shots reportedly originated, and upon seeing the patrol car stopping and then reversing slightly and moving away from Ellefritz, and the driver yelling that "they are still down there," support the initial stop of that vehicle, if for no other reason than to inquire if they were witnesses to the shooting or to learn if they had been involved in the shooting.

Rickmon conditionally pleaded guilty to the one-count indictment and reserved his right to appeal the district court's denial of his motion to suppress. *See* Fed. R. Crim. P. 11(a)(2).

---

was in the system's coverage zone. We express no further opinion on the matter.

On May 31, 2019, the district court sentenced Rickmon to 75 months in prison and accordingly entered judgment. This timely appeal ensued.

## II. Discussion

Under the Fourth Amendment, police "officers may conduct a brief investigatory stop," sometimes referred to as a *Terry* stop, "if they reasonably suspect that an individual has committed or is about to commit a crime." *Torry v. City of Chicago*, 932 F.3d 579, 587 (7th Cir. 2019) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "Reasonable suspicion requires specific and articulable facts which, taken together with rational inferences from those facts, suggest criminal activity." *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019) (citation and internal quotation marks omitted). We review the objective reasonableness of a *Terry* stop de novo. *See United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018).

"While 'inarticulate hunches' are not enough, 'reasonable suspicion is a lower threshold than probable cause' and 'considerably less than preponderance of the evidence.'" *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (citations omitted). Our task is to objectively examine the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Id.* (citation omitted). We are mindful that "[r]easonable suspicion is a 'commonsense, nontechnical' concept that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Wanjiku*, 919 F.3d 472, 488 (7th Cir. 2019) (citation omitted).

Rickmon argues that ShotSpotter, standing on its own, should not allow police officers to stop a vehicle in the immediate vicinity of a gunfire report without any individualized suspicion of that vehicle. We generally agree with this proposition. Indeed, we question whether a single ShotSpotter alert would amount to reasonable suspicion. But we disagree with Rickmon's conclusion that, in this case, the officer had only an "unparticular hunch"—rather than "specific and articulable facts"—that the car connected back to the crimes. As the district court found, the totality of the circumstances establishes the officer stopped the car for more reasons than just its location in ShotSpotter's coverage zone.

Rickmon is certainly correct that "[a] mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property." *United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012); *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

He likens his case to *Bohman*; however, that decision is distinguishable. As we have explained previously, "[i]n *Bohman*, police stopped a car exiting property that officers suspected of housing a methamphetamine lab. That suspicion resulted from a tip they had received, but when police stopped the car, they had not yet corroborated the tip in any way." *United States v. Richards*, 719 F.3d 746, 757 (7th Cir. 2013) (citation omitted). We "found no reasonable suspicion for the stop because the only information pointing to criminal activity was

the defendant's emergence from property that an uncorrobo-rated tip accused of housing a meth lab. That alone was insuf-ficient." *Id.* (citation omitted).

Rickmon asserts that the sergeant in *Bohman* had, in fact, *more* suspicion than Officer Ellefritz did here. He reasons that ShotSpotter is less reliable than the informant there (or a wit-ness in any other case) because it "does not provide any spe-cific information about suspects or vehicles, it simply records sounds." Again, we can assume for the sake of argument that Officer Ellefritz needed "something extra" beyond the ShotSpotter report. But Rickmon mistakenly claims that the *only* other information the officer had when he made the stop was the radio dispatch. This was not the only other infor-mation the officer had to go on, and that is why Rickmon is unlike the defendant in *Bohman*.

In cases where an officer stops a car departing a suspected crime scene, we have considered a number of circumstances relevant to our reasonable suspicion analysis: (1) the reliabil-ity of any reports to police; (2) the dangerousness of the crime; (3) the temporal and physical proximity of the stop to the crime; (4) any description of the vehicle and relevant traffic; and (5) the officer's (or potentially even the department's) ex-perience with criminal activity in that area. *See United States v. Burgess*, 759 F.3d 708, 710–11 (7th Cir. 2014); *United States v. Brewer,* 561 F.3d 676, 679 (7th Cir. 2009).[3] We now apply these factors to Rickmon's case.

---

[3] It is clear from our caselaw that a car's vicinity to a suspected crime scene is rarely, if ever, the only articulable fact justifying a traffic stop. Moreover, Rickmon's apparent bright-line rule that an officer must always identify a suspect or vehicle by matching real-time observation with a previous re-port is anathema to our evaluation of the totality of the circumstances. *See*

*First*, and as Rickmon concedes, Officer Ellefritz received two ShotSpotter alerts and two dispatches reporting a shooting on North Ellis. The details gleaned from the 911 calls that the dispatcher passed on to Officer Ellefritz highlight that he did not merely act on uncorroborated information. Granted, we take Rickmon's point that ShotSpotter is not comparable to an eyewitness or known informant; instead, we conclude it is analogous to an anonymous tipster. So, what Officer Ellefritz ends up with is an anonymous tip from ShotSpotter that the 911 calls then independently confirmed. "Corroboration from multiple sources describing the general area and nature of the same crime exceeds the single police tip that alone can supply reasonable suspicion for a stop." *Burgess*, 759 F.3d at 710; *see also Florida v. J.L.*, 529 U.S. 266, 270–71 (2000) (similar).

Here, the radio dispatches that Officer Ellefritz listened to on his way to the site of the shooting corroborated the ShotSpotter alerts by relaying accounts of cars leaving the scene and an individual running away from the shooting.[4]

---

*Harris*, 568 U.S. at 245 (rejecting a bright-line rule in the probable cause context because "[a] gap as to any one matter … should not sink the State's case; rather, that 'deficiency … may be compensated for, in determining the overall reliability of a tip, by a strong showing as to … other indicia of reliability.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983))); *see also Brewer*, 561 F.3d at 677–79 (concluding a traffic stop was reasonable even though, as in this case, the officer had no description of the vehicle or its occupants but did notice that it was the sole vehicle passing through the area's only exit in the middle of the night).

[4] The government encourages us to rely on a later 911 call from an individual at 2227 North Ellis reporting "a bunch of gunfire" and five cars moving north as a circumstance relevant to our reasonable suspicion analysis. But the police dispatcher did not convey this additional information to any of the officers en route. We need not rely on this fact to resolve this

And "[m]ultiple … report[s] [of] shots fired in the same gen-
eral area, creat[es] heightened suspicion of a serious

---

appeal because it does not tip the scales one way or the other. Officer Elle-
fritz was on firm footing when he stopped Rickmon's car without these
details.

Even if this 911 call was decisive, however, it cannot justify the stop
anyway because Officer Ellefritz did not know about it. *See Brewer*, 561
F.3d at 677–78 (reasoning that facts learned after a traffic stop cannot sup-
port it *post hoc*) (citations omitted). Officer Ellefritz must have been able to
articulate his suspicion of Rickmon's car when he stopped it and he cannot
now articulate facts that were then unavailable to him. *See United States v.
Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015). "The fact that the 911 operator
turned out, after the fact, to have additional information which would
have given the arresting officers reasonable suspicion cannot retroactively
make their actions objectively reasonable." *United States v. Colon*, 250 F.3d
130, 138 (2d Cir. 2001) (citation omitted).

The government maintains that we should contemplate the "collective
knowledge" of all law enforcement personnel, including the police dis-
patcher, who were in communication regarding the investigation. But the
government admits that the dispatcher did not broadcast this 911 call to
the responding officers. And "imputed knowledge does not trump actual
knowledge …." *United States v. Hicks*, 531 F.3d 555, 560 (7th Cir. 2008) (ci-
tation omitted). By conceding that the dispatcher did not transmit the con-
tents of the 911 call to Officer Ellefritz, the government effectively rebutted
any presumption of communication (and thus in favor of collective
knowledge) between those two individuals. *See United States v. Brown*, 496
F.3d 1070, 1071 n.2 (10th Cir. 2007) (citing *United States v. Shareef*, 100 F.3d
1491, 1503–04 (10th Cir. 1996)).

We conclude that the government cannot justify an investigative stop
based on information that a 911 caller provides to a dispatcher who does
not, in turn, notify the police on the scene. *See Colon*, 250 F.3d at 137 ("Im-
puting information known only to the civilian operator and not conveyed
to the dispatching and then arresting officers would extend the doctrine
beyond its current jurisprudential parameters and vitiate the privacy safe-
guards of the Fourth Amendment ….").

crime …." *Id.* at 711. Officer Ellefritz therefore had a good idea of what to be on the lookout for when he arrived.

*Second*, Officer Ellefritz was responding to an emergency report of shots fired, not one of general criminality. We have repeatedly emphasized in our decisions that the inherent danger of gun violence sets shootings apart from other criminal activity. *See, e.g., id.* at 710–11 (distinguishing *Bohman* from *Brewer* because of the apparent lack of immediate danger in *Bohman*). In *Burgess*, another case involving a shooting, we underscored that "the threat to public safety was serious, and the officers had to assume that it was continuing in process." *Id.* at 711; *see also Brewer*, 561 F.3d at 679 (explaining the police "had a compelling reason to ask questions of the driver or passenger of the sole vehicle departing from a building complex in which shots had been fired (and not for the first time), in order to protect the police officers who were about to enter the complex.").

Indeed, an emergency report "can support an officer's reasonable suspicion with less objective evidence to corroborate the report." *United States v. Williams*, 731 F.3d 678, 684 (7th Cir. 2013) (citing *United States v. Hicks*, 531 F.3d 555, 559–60 (7th Cir. 2008)). In *Williams*, we determined that an anonymous 911 call justified a stop where "there was a large group of people being loud and waving guns in a location at which violent crime and drug activity is regularly reported." *Id.* This rule requiring less substantiation before making a stop based on an emergency report enables the police officer "to obtain for his own safety and that of the other officers as much information about the situation in the [area] as he could before they entered it in the dark." *Brewer*, 561 F.3d at 678.

*Third*, Officer Ellefritz encountered Rickmon's vehicle on the same block of the shooting five-and-a-half minutes after he received reports of shots fired. Rickmon claims that no criminal in their right mind would stick around a crime scene for that long. But we are not so sure. We know the shooting continued after the initial ShotSpotter alert. Moreover, this time frame is consistent with others in our caselaw. *See, e.g.*, *Burgess*, 759 F.3d at 709 ("Just over four minutes had passed from the initial dispatch about gunshots to the officers' report that Burgess was in custody."); *Brewer*, 561 F.3d at 677 (noting that officers observed the suspicious car minutes after the original radio dispatch). Common sense counsels that a person may take minutes rather than seconds to flee for any number of reasons, including the destruction of evidence, an injury sustained in the shooting, or a need to hide in place. As both a matter of fact and law, then, five-and-a-half minutes is not unduly long.

Rickmon's vehicle was also driving away from the site of the shooting on the only street leading from it. *See United States v. Street*, 917 F.3d 586, 594 (7th Cir. 2019) ("The totality of circumstances, however, may provide additional and reasonable limits, particularly with respect to place and time, so as to allow a stop based on a fairly general description."). Considering the facts here, it was a "natural surmise that whoever fired the shots" would be in the vehicle that Officer Ellefritz stopped. *Brewer*, 561 F.3d at 678; *see also Burgess*, 759 F.3d at 711 (stating that "the officers had … a street location to zero in on" when a car "pass[ed] them (going the other way and out of the area)" so "one might reasonably expect the shooter's vehicle" to be that one). Based on these facts, it was

rational for Officer Ellefritz to infer that Rickmon's car partic-
ipated in the gunfight because it was the only vehicle on the
street of the shooting.

*Fourth*, Officer Ellefritz did not have the description of any
vehicle; however, it was 4:45 a.m. and there was no other traf-
fic. Again, in such a scenario, "[t]he hour reinforce[s] the sus-
picion" because we realistically expect few people on the road
at that time. *Brewer*, 561 F.3d at 678; *see also Burgess*, 759 F.3d
at 711 ("And because of the light traffic late on that Sunday
night, there was a good chance that seeing Burgess's car at
that time and place was more than a coincidence."). Hence, it
was reasonable—not random—to pull Rickmon over. *See
Brewer*, 561 F.3d at 679 (ruling that the responding officer "was
not acting randomly in deciding that the only car emerging
from the apartment complex moments after he heard shots
from within it should be intercepted").

*Fifth*, and finally, Officer Ellefritz knew that he was head-
ing toward a block that he once patrolled and where in the
past he had responded to shots-fired calls. Indeed, he esti-
mated that he responded to these couple blocks once per
night. To be fair, there was no evidence in the record that this
was a so-called "high crime area." Instead, Office Ellefritz tes-
tified that he had personal knowledge of criminal activity in
that part of Peoria. He was of course right to "draw on his
own experience and specialized training to make inferences
from and deductions about the cumulative information avail-
able … that might well elude an untrained person." *United
States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (quoting *United
States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also Brewer*, 561
F.3d at 679 (bearing in mind that the officer "had three years'
experience with criminal activity in the particular housing

complex …"). Simply put, we have never required officers "to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Altogether, the circumstances here—the reliability of the police reports, the dangerousness of the crime, the stop's temporal and physical proximity to the shots, the light traffic late at night, and the officer's experience with gun violence in that area—provided reasonable suspicion to stop Rickmon's vehicle. As in similar past challenges to automobile seizures, "there is 'far more in this case … than … mere physical proximity' to the criminal activity." *Richards*, 719 F.3d at 758 (quoting *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir. 1992)); *see also Burgess*, 759 F.3d at 710. Multiple circumstances separate Rickmon's case from others. In isolation, any one of those circumstances might not be sufficient.[5] But viewed collectively, they start to seem suspicious. "In such a situation, it is reasonable for police to act quickly lest they lose the only opportunity they may have to solve a recent violent crime or to interrupt an advancing one." *Burgess*, 759 F.3d at 711.

### III. Conclusion

For the reasons stated above, the district court appropriately denied Rickmon's motion to suppress. We therefore AFFIRM Rickmon's resulting conviction and sentence.

---

[5] Even then, "*Terry* accepts the risk that officers may stop innocent people." *Wardlow*, 528 U.S. at 126.

WOOD, *Chief Judge*, dissenting. If the Fourth Amendment stands for anything, it stands for the proposition that the police cannot seize anyone without adequate, individualized reason to do so. Sometimes that reason must provide probable cause for the seizure; sometimes it is enough that the police have reasonable suspicion pointing to the person detained. But, with the exception of general roadblocks that satisfy the standards articulated in *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)—a situation that all agree is not present in the case before us—the police cannot simply *force* every person or every car to stop, in the hopes that they might uncover evidence of a crime. That would amount to a general warrant, precisely the evil that the drafters of the Fourth Amendment wanted to avoid.

The question before us in this case is whether Officer Travis Ellefritz, of the Peoria (Illinois) Police Department, had the requisite individualized suspicion to order the car in which defendant Terrill Rickmon was riding to stop. Ellefritz was responding to two different reports he received around 4:40 a.m. of gunshots having been fired in the immediate area of the 2200 block of North Ellis Street, within the city limits of Peoria. North Ellis is a two-block street that dead-ends at its south end, intersects with Archer Street in the middle, and "T's" into West McClure Avenue at its north end. Top to bottom, North Ellis is a little more than 430 yards (four football fields plus a little).

The majority recognizes that the validity of the stop rises or falls based only on the knowledge Ellefritz had at the time he stopped the car; no later-acquired facts can retroactively save it. Here is what he knew, and how he knew it:

- The ShotSpotter system in his squad car registered multiple gunshots at 2203 North Ellis around 4:40 a.m. on July 29, 2018.

- That address is near the south end of the street, where it dead-ends.

- The police dispatcher announced two "shots fired" alerts detected by ShotSpotter over the radio.

- The police dispatcher informed Ellefritz that a 911 call had come in reporting gunfire on North Ellis.

- The 911 caller also said that there were several cars leaving the location and one black male on foot.

- Between three and a half and five minutes after receiving the initial ShotSpotter dispatch, Ellefritz reached North Ellis Street.

- As he drove south on the street, he saw a car turn from the east side of the street and proceed northbound. He saw no other cars on the road.

Based on that information, Ellefritz decided to stop the car. He turned on his emergency lights, maneuvered his car to block the northbound land, and the car began to stop. It came to a complete halt when Ellefritz yelled at the occupants to stop and stay where they were.

The only thing that distinguished the car Ellefritz chose to stop was that it existed, and it was the only car on the street at that early hour of the morning. None of the information he had received even hinted at the shooter's car's make, color, age, style, or anything else. Indeed, though I do not rely on this subjective fact, Ellefritz frankly admitted that he would

have stopped literally any car he saw on North Ellis based on the information he had.

It appears that it is illegal for a person to discharge a gun within the corporate limits of Peoria, other than at a licensed shooting gallery, gun club, or rifle club. Peoria City Ordinance, sec. 20-161(a). It was thus reasonable for Ellefritz to think that the discharge of a gun was unauthorized, despite all the changes in gun regulation that have followed the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). But virtually nothing connected those sounds with the car he decided to stop, or indeed with any car at all—it was just as likely that the shooter had retreated into a nearby house or fled on foot (as the 911 caller indicated).

My colleagues are willing to assume that because, some five minutes after the shots were heard, this was the only car on North Ellis, the people in it must have been associated with the shots. But that is pure speculation. July 29 fell on a Sunday in 2018. Nonetheless, some workplaces operate on a seven-day week, and early-morning shifts are by no means unheard-of: think of production workers, grocery stockers, transportation workers, bakers, and baristas, to name just a few. Or the driver might have needed to go from Peoria to Chicago, or Springfield, or St. Louis, for social reasons or a business appointment and wanted an early start. Or maybe the driver was at a late party. The time of day, and the fact that the road was largely empty, do not add up to anything.

The 911 caller reported a man running away from the area where the noises were heard, but Ellefritz did not stop a running man. And the street is so short – about a quarter of a mile (one lap around a track)—that the runner would have been long gone before Ellefritz pulled up in his car. Again, one

could speculate that the shooter stayed around and then got into the car that Ellefritz stopped. But that speculation is utterly unsupported. It was equally plausible to speculate that (a) the shooter ran across the grass to the parking lot south of the dead end and quickly slipped out of sight, or (b) the shooter took refuge in one of the surrounding houses, or (c) the shooter crossed over Archer Street and rendezvoused with his ride a safe block away.

My colleagues also stress that Ellefritz believed that he was responding to an emergency, because gunshots always connote emergency. Perhaps they do. But how much does this prove? Would it have entitled the police to force their way into every house on North Ellis, to make sure that the shooter was not threatening anyone in those houses? Would it have allowed the police to stop any and every car they saw within 1,000 feet of the point that ShotSpotter identified? My answer to both those questions is no. And I cannot agree with my colleagues that a single car proceeding north, at the speed limit, signals an emergency. There was some talk in the district court about North Ellis being part of a "high crime" area, but my colleagues admit that "there was no evidence in the record that this was a so-called 'high crime area.'" *Ante* at 13.

Finally, my colleagues worry that compliance with the Fourth Amendment here might have allowed a culpable person to avoid being arrested. But there are two responses to this point. First, the requirement that the police must have either probable cause or at least reasonable suspicion before arresting someone will, in some instances, hamper their activities. That is exactly what happened in *Ybarra v. Illinois*, 444 U.S. 85 (1979), when the Supreme Court held constitutionally impermissible a search warrant that allowed the police to

search, pat down, and seize any of the patrons of a small tavern. It did so despite the fact that the search revealed that Ventura Ybarra possessed heroin. Second, Rickmon's offense was being a felon in possession of a firearm. To this day, no one has suggested that he was the shooter. If anything, the fact that his leg had been wounded by a bullet indicated (after the fact) that he was a *victim* of the shooter.

I would hold that Rickmon's motion to suppress the evidence should have been granted, and I would remand for further proceedings. I therefore respectfully dissent.