Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/18/2018 09:08 AM CDT

State of Nebraska, appellee, v.
Colton W. Sievers, appellant.
___ N.W.2d ___

Filed May 18, 2018.    No. S-17-518.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.

3. **Constitutional Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Search and Seizure.** Temporary detention of individuals during the stop of a moving automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment.

4. **Search and Seizure: Evidence: Trial.** Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.

5. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Special law enforcement concerns, such as a police roadblock, checkpoint, or other detention, made for the gathering of information will sometimes justify the stop of a vehicle without individualized suspicion.

6. **Search and Seizure: Arrests.** Reasonableness of seizures that are less intrusive than a traditional arrest involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the

seizure advances the public interest, and the severity of the interference with individual liberty.

7. **Constitutional Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** For purposes of determining the reasonableness, under the Fourth Amendment, of a vehicle stop made without reasonable suspicion, a central concern in balancing the public interest and the interference with individual liberty is to ensure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Nathan J. Sohriakoff for appellant.

Douglas J. Peterson, Attorney General, and Joe Meyer for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, and STACY, JJ., and MOORE, Chief Judge, and ARTERBURN, Judge, and DOYLE, District Judge.

DOYLE, District Judge.

Colton W. Sievers appeals from his conviction for felony possession of a controlled substance. The issue presented is whether the stop of Sievers' vehicle for the purpose of gathering information about the presence of stolen firearms and other criminal activity at the residence he drove from, for which a search warrant was being sought, violated Sievers' constitutional right to be free from unreasonable searches and seizures. We determine that the stop of Sievers' vehicle was reasonable and affirm the decision of the district court.

## BACKGROUND

In the early morning of February 22, 2016, the York County Sheriff's Department received a report of a burglary at a rural York, Nebraska, residence, where a large John Deere gun safe had been stolen. The safe contained a Ruger

9-mm semiautomatic pistol, several shotguns, jewelry, approximately $30,000 in cash, legal documents, and gold coins. Law enforcement officials immediately began an investigation. Two suspects were identified, and on February 24, the York County Sheriff's Department obtained arrest warrants and arrested the suspects the next day. Investigators interviewed the suspects, and one of them confessed to the burglary and agreed to cooperate with investigators.

The burglar informant told York County investigators he took the safe to a residence in Lincoln, Nebraska; cut it open; and traded gold coins and money for methamphetamine. The informant stated the safe and firearms would still be at the Lincoln residence.

The next day, on February 26, 2016, officers transported the informant to Lincoln, at which time, a York County sheriff's deputy, Paul Vrbka, met with Sgt. Duane Winkler, a supervisor with the Lincoln-Lancaster County Narcotics Task Force, to confirm the location of the building which contained the stolen property. Following the informant's directions, Vrbka, Winkler, and the informant drove down an alley in a residential Lincoln neighborhood. The investigators and the informant stopped, and the informant pointed out the residence, located next to the alley. The residence was a single-story garage-type outbuilding on the same property but located to the rear of the main house, and was described by the investigators as the "target address."

Vrbka and Winkler observed a black Volkswagen Beetle parked in an offstreet driveway next to the outbuilding. The informant stated the Volkswagen was owned by the resident of the target address, who was a "'big methamphetamine dealer.'" The informant stated that when he delivered the stolen safe to the target address, he had witnessed the resident use a digital measuring scale to sell his accomplice 2 ounces of methamphetamine for $3,000 in cash. He stated the resident had between 6 to 10 ounces of methamphetamine in the house at that time and that he had gone to her house to

purchase methamphetamine on a prior occasion. Investigators in the task force confirmed that the license plate attached to the Volkswagen was registered to the person residing at the target address. With the informant's assistance, investigators obtained a photograph of the suspected methamphetamine dealer, which matched the driver's license photograph of the registered owner of the Volkswagen.

Winkler then set up "pre-warrant investigation" surveillance units to monitor and observe activity at the residence. Winkler informed plainclothes and uniformed officers that stolen items had been transported to the residence, that drugs had been purchased there, and that more drugs may be present. Winkler advised the surveillance officers that they were to help prevent evidence from leaving the target address before the investigation was completed. The officers exercised a higher level of caution due to the possible presence of firearms.

Plainclothes narcotics officers were located near and in sight of the target address, including Eric Schilmoeller, a deputy sheriff for the Lancaster County Sheriff's office who was driving an unmarked van. Two Lincoln Police Department uniformed "gang officers," Max Hubka and Cole Jennings, were recruited to participate in the surveillance. The gang officers made contact with the plainclothes narcotics officers and discussed the investigation.

At approximately 5 p.m., on February 26, 2016, the gang officers, in full police uniform, parked their marked police cruiser out of view of the target residence two blocks away. The gang officers were positioned to be available to assist the plainclothes narcotics officers, including using the marked police cruiser with overhead emergency lights to stop a vehicle that left the area if so directed.

During this time, Vrbka and Winkler were in the process of preparing an affidavit for a search warrant for the residence and a camper-style vehicle located on the same property. Once surveillance units were in place, Vrbka and Winkler left

the scene in order to present the warrant to a judge. Winkler continued to monitor the radio and supervise the surveillance officers, who were communicating with each other and Winkler.

Schilmoeller drove the unmarked van through the alley behind the target residence and observed a "white work type pickup truck" parked next to the Volkswagen. The truck had an open bed with a ladder rack and a large, closed toolbox against the truck's cab. The vehicles were parked side-by-side in the back yard of the target residence. The investigators recorded the license plates for both vehicles.

At 5:20 p.m., Schilmoeller observed the truck begin to drive away from the outbuilding via the alley. The truck turned onto a residential street and turned left to drive north on 10th Street. Schilmoeller notified other members of the task force and asked Winkler how to proceed. Winkler advised the officers to make a traffic stop to prevent the truck from leaving with any stolen items. According to Winkler, who was no longer at the scene under surveillance, there was a need to "both stop the [truck] and search it for any items taken from the burglary in York County." While following the truck, the officers verified the truck had the same license plate as the truck that was parked next to the Volkswagen. The gang officers activated the cruiser's overhead emergency lights and stopped the truck. The stop occurred five blocks from the target address and was made without the observation of a traffic or other law violation.

Hubka observed the truck had only one occupant and saw the driver lean over and reach toward the center console area. Hubka considered the driver's actions to be "furtive movements," and consequently, he maintained a heightened security alert in case the driver was hiding something or reaching for a weapon. The officers testified they were "extra assertive" as they contacted the driver of the truck—in part because of the possible presence of a firearm. They ordered the driver, Sievers, to put his hands on the steering wheel and to not

move as they helped remove him from the vehicle. The gang officers searched the interior driver's side of the truck and did not locate any weapons, narcotics, paraphernalia, or any stolen items.

The narcotics officers, who were following the truck in their unmarked vehicle, arrived simultaneously. Schilmoeller took over contact with Sievers, walked him to the cruiser, and sat him in the back of the cruiser with the door open and began questioning him. Sievers claims the officers had their guns drawn at this time, but not pointed at him. Sievers claims he was handcuffed during the officer's questioning. None of the officers remember any guns being drawn, and only Schilmoeller remembered when Sievers was handcuffed, which he stated occurred after the questioning was completed.

Schilmoeller informed Sievers he was not under arrest, but was being detained due to a stolen property and narcotics investigation underway at the residence he had just driven from. Sievers admitted he had just been inside that residence and had just smoked marijuana before leaving, but "that was it." Schilmoeller attempted to obtain Sievers' consent to search the truck several times, but Sievers refused, stating that there were no illegal items inside the truck and that the truck belonged to his boss. Schilmoeller relayed to Winkler Sievers' admission that he had smoked marijuana at the target address and that Sievers had denied the request to search the truck.

As the truck was leaving, and at the same time he instructed the officers to stop the truck, Winkler also instructed another group of officers to "lock down" the residence to prevent anyone inside from destroying evidence. Winkler was concerned the person in the truck may have had an opportunity to contact a person inside the residence by cell phone. Those officers "knocked and announced and ordered any occupants to come to the door." After 30 seconds, they observed movements inside the residence which they believed indicated the destruction of evidence, at which point they forced entry and took the

resident into custody. At that time, the officers observed several items of drug paraphernalia in plain view.

The officers at the residence relayed the information to Winkler, who radioed Schilmoeller to inform him about the presence of drug paraphernalia in the residence. Winkler advised Schilmoeller to search the truck.

Schilmoeller searched all areas of the truck and located two small plastic bags containing 3.1 grams of methamphetamine inside of a soda pop can found near the center console. He then arrested Sievers, and he testified that he placed Sievers in handcuffs at that time. The search warrant was signed approximately 1½ hours later.

Sievers was charged by information with possession of a controlled substance, methamphetamine, a Class IV felony. He was arraigned and pleaded not guilty.

Sievers filed a motion to suppress evidence obtained from the stop. The court heard testimony from Hubka and Jennings, the gang officers who conducted the stop; Schilmoeller, the narcotics officer who questioned Sievers and conducted the search of the truck; Winkler, the supervisor who ordered the stop and search of the truck and the search of the target residence; and Sievers. Vrbka, the author of the warrant affidavit, did not testify.

The officers explained their knowledge of the situation at different points in the investigation, their process of relaying information to each other, and how they reacted based on their discovery of new information as the investigation progressed. None of the officers who testified, however, observed Sievers inside the residence, leave the residence, put anything into the truck, or enter the truck. The informant had not provided any information about Sievers or the truck.

Sievers asserted the officers had no way of knowing whether he had been in the residence prior to the stop. Schilmoeller disagreed, stating he had observed that the truck was unoccupied, he observed the truck leave, and when the truck was stopped, Sievers was driving the truck. But Schilmoeller admitted that

at the time of the stop, the only reason he had to believe that Sievers had been in the target address was the fact the truck was parked in the driveway, next to the Volkswagen, and that he had observed it drive away from the residence. Schilmoeller admitted he was not in a position to see if someone came from the residence and got into the truck.

The trial court overruled the motion to suppress, stating it found the officers' testimony to be credible. The court stated that "there was an ongoing investigation and the officers had reasonable cause to believe that a crime had been committed and had reasonable suspicion to justify the stop even though the information was not complete or precise."

The matter proceeded to a stipulated bench trial. Sievers renewed his motion, which the court overruled. The court found Sievers guilty and sentenced him to serve 90 days in the county jail, with 3 days' credit for time served and 1 year's postrelease supervision. Sievers appeals.

## ASSIGNMENT OF ERROR

Sievers assigns the trial court erred in determining reasonable suspicion existed to justify his stop and detention.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[1]

## ANALYSIS

[2-4] The issue presented is whether the suspicionless stop of Sievers to gather information about stolen property and

---

[1] *State v. Baker*, 298 Neb. 216, 903 N.W.2d 469 (2017).

possible criminal activity at the residence he drove from, for which a search warrant was being sought, violated Sievers' Fourth Amendment rights. The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.[2] Temporary detention of individuals during the stop of a moving automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment.[3] Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.[4]

There is no dispute in this case that a seizure of Sievers occurred when he was stopped by police. We note that Sievers has challenged only the initial stop by police; neither the probable cause search of the truck nor Sievers' arrest are at issue in this appeal.

[5] Even a brief, limited governmental intrusion for the purpose of investigation must be justified at its inception by a showing of reasonable suspicion.[5] A seizure for the purpose of seeking information when police are investigating criminal activity that might pose a danger to the public, however, may be reasonable under the Fourth Amendment even in the absence of reasonable articulable suspicion of criminal conduct.[6] The U.S. Supreme Court has explained that "special law enforcement concerns," such as a police roadblock, checkpoint, or other detention made for the gathering of information, will

---

[2] *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014).

[3] See, *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[4] *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[6] *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016). See, *U.S. v. Brewer*, 561 F.3d 676 (7th Cir. 2009); *Gipson v. State*, 268 S.W.3d 185 (Tex. App. 2008); *State v. Garrison*, 911 So. 2d 346 (La. App. 2005); *Baxter v. State*, 274 Ark. 539, 626 S.W.2d 935 (1982).

sometimes justify a stop of a vehicle "without individualized suspicion."[7] "Like certain other forms of police activity, say, crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual."[8] In *Illinois v. Lidster*,[9] the U.S. Supreme Court scrutinized a highway checkpoint that was set up to solicit information from motorists regarding a fatal hit-and-run accident. The Court found that a suspicionless, "information-seeking" stop made pursuant to the checkpoint was constitutional.[10] The Court emphasized the "primary law enforcement purpose [behind the checkpoint] was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others."[11]

The facts of *Lidster* concerned a checkpoint set up 1 week after the accident, at the same time of night and in the same location. The checkpoint was "designed to obtain more information about the accident from the motoring public."[12] The Court distinguished an "information-seeking" stop, like the stop in *Lidster*, from the checkpoint program at issue in *Indianapolis v. Edmond*,[13] which involved a vehicle checkpoint established for the purpose of discovery and interdiction of drug crimes, an objective which the Court said served a "'general interest in crime control.'"[14] The Court found that

---

[7] *Illinois v. Lidster*, 540 U.S. 419, 424, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004).

[8] *Id*., 540 U.S. at 424-25.

[9] *Lidster, supra* note 7.

[10] *Id*., 540 U.S. at 426.

[11] *Id*., 540 U.S. at 423 (emphasis in original).

[12] *Id*., 540 U.S. at 422.

[13] *Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000).

[14] *Lidster, supra* note 7, 540 U.S. at 424.

the prohibition in *Edmond* on searches conducted pursuant to a "'general interest in crime control'" did "not refer to every 'law enforcement' objective" and stated that "special law enforcement concerns will sometimes justify highway stops without individualized suspicion."[15]

[6,7] Although a suspicionless information-seeking stop is not per se unreasonable, that does "not mean the stop is automatically, or even presumptively, constitutional. It simply means that [a court] must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances."[16] In determining whether the stop of Sievers was reasonable, we apply the three-part balancing test outlined in *Brown v. Texas*,[17] which recognizes that warrantless seizures without reasonable suspicion may be reasonable under certain circumstances.

> The reasonableness of seizures that are less intrusive than a traditional arrest . . . depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." . . . Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. . . .
>
> A central concern in balancing these competing considerations in a variety of settings has been to [en]sure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. . . . To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's

---

[15] *Id.*, citing *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990).

[16] *Id.*, 540 U.S. at 426.

[17] *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979).

legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.[18]

In *Lidster*, the U.S. Supreme Court applied the balancing test from *Brown* and found that the suspicionless checkpoint stop at issue was reasonable.[19] We have also addressed the constitutionality of checkpoint stops. In *State v. Crom*,[20] we cited *Brown* and found that a motorist has a reasonable expectation of privacy which is not subject to arbitrary invasions solely at the unfettered discretion of police officers in the field. We found the checkpoints at issue were unconstitutional, because they were not administered pursuant to an official plan and the officers were therefore free to subject motorists to arbitrary invasion at their unfettered discretion.[21]

More recently, in *State v. Piper*,[22] we applied *Brown* and cited *Lidster* in determining that the stop of a vehicle at a highway checkpoint conducted by the Nebraska State Patrol was reasonable. We noted that in *Michigan Dept. of State Police v. Sitz*,[23] the U.S. Supreme Court approved the use of sobriety checkpoints intended to prevent drunk driving. We considered the purpose of the checkpoint, the degree of intrusion, and the discretion of the officers. We found the stop was reasonable, because the checkpoint was intended to target alcohol violations, the degree of intrusion was minimal, and the checkpoint was authorized by an approved plan and conducted in a manner that complied with the plan and did not allow

---

[18] *Id.*, 443 U.S. at 50-51 (citations omitted).

[19] *Lidster, supra* note 7.

[20] *State v. Crom*, 222 Neb. 273, 383 N.W.2d 461 (1986).

[21] *Id.*

[22] *Piper, supra* note 2.

[23] *Sitz, supra* note 15.

the officers to exercise unfettered discretion in administering the checkpoint.[24]

We addressed the constitutionality of an information-gathering stop of a vehicle that did not involve a checkpoint or roadblock in *State v. Woldt*.[25] In that case, an officer was investigating a report of knocked-over traffic cones when, while picking up the cones, he heard squealing tires, and he then stopped a vehicle he thought might be involved. After the first vehicle pulled over and stopped near the police cruiser, a second vehicle that the officer had seen driving within a car length or less of the first vehicle parked across the street from the police cruiser. The officer approached the first vehicle and smelled the odor of alcohol and observed signs that the driver might have been impaired. The second vehicle reversed as if to drive away, but stopped when the officer signaled the driver to do so.

The officer wanted to speak with the second driver about the first driver's activities. The officer then observed the second driver was impaired, and the second driver was then arrested, charged, and convicted of driving under the influence. In applying the test from *Brown*, we determined the stop was reasonable because of the following: The circumstances presented a grave public concern; driving under the influence, which can rise to the level of a Class II felony, presents a threat to other citizens on the road; the stop advanced the public interest, because it was reasonable to conclude the second driver would have relevant information and the stop would have allowed the officer to obtain the driver's contact information and a witness statement; and the interference with the driver's liberty was slight, because he had already stopped.[26]

---

[24] *Piper, supra* note 2.

[25] *Woldt, supra* note 6.

[26] *Id.*

Since *Lidster*, courts have applied the special law enforcement concerns rationale to non-checkpoint stops and found such stops reasonable.[27] In *U.S. v. Brewer*,[28] the Seventh Circuit applied *Lidster* and upheld a stop of a vehicle based upon a report of gunfire when it was the only vehicle seen driving from an apartment complex renowned for criminal activity. The court found that even though there was no evidence the driver had committed any law violations, the stopping officer was "not acting randomly in deciding that the only car emerging from the apartment complex moments after he heard shots from within it should be intercepted."[29]

The court further observed, "It was a natural surmise that whoever fired the shots had left the complex, and the street that the defendant's vehicle was driving on was . . . the only street leading from it, and he was driving away from rather than towards it . . . and, sure enough, there was no other traffic."[30]

The court balanced the dangerousness of the crime against the intrusion on the occupants of the vehicle and explained the vehicle stopped

> was the only vehicle on the road at that late hour in this high crime area, and it was pulled over and stopped for only moments before the officers making the stop learned that the SUV had been seen at the site of the shooting and that the occupants may have been involved in the shooting.[31]

---

[27] See, e.g., *Brewer, supra* note 6; *Gipson, supra* note 6; *State v. Mitchell*, 145 Wash. App. 1, 186 P.3d 1071 (2008); *State v. Watkins*, 207 Ariz. 562, 88 P.3d 1174 (Ariz. App. 2004). See, also, *State v. Pierce*, 173 Vt. 151, 787 A.2d 1284 (2001) (applying *Brown* factors pre-*Lidster*); *In re Muhammad F.*, 94 N.Y.2d 136, 722 N.E.2d 45, 700 N.Y.S.2d 77 (1999) (same).

[28] *Brewer, supra* note 6.

[29] *Id*. at 679.

[30] *Id*. at 678.

[31] *Id*. at 679.

This case presents a seizure that is less intrusive than a traditional arrest. Thus, the application of the *Brown* balancing test is appropriate.

### GRAVITY OF PUBLIC CONCERN

Under the first prong of the test from *Brown*, a court should consider the gravity of the public concern served by the seizure. The public concern presented by the facts of this case is the officers' investigation of the York County burglary, as well as their investigation of a distributor of large quantities of methamphetamine.

The criminal investigation produced evidence that stolen property was inside the target residence, including firearms, jewelry, approximately $30,000 in cash, and gold coins. The resident's receipt of stolen property constitutes theft.[32] The value of the stolen items in this case exceeded $5,000, which constitutes a Class IIA felony.[33] In addition, there is the apparent concern that a semiautomatic pistol and shotguns were stolen and unaccounted for. In the context of the investigation, these weapons could have been used in connection with narcotics transactions, which presents safety risks to police officers and the public. Further, the knowing receipt, retention, or possession of a stolen firearm is a Class IIA felony.[34]

In the officers' testimony, they articulated specific facts which led them to believe that methamphetamine was being sold from the residence. The officers learned from the informant, whose reliability has not been called into question,[35] and whose information was only 5 days old at the time, that between 6 and 10 ounces of methamphetamine were at the residence. The possession with the intent

---

[32] See Neb. Rev. Stat. § 28-510 (Reissue 2016).

[33] See Neb. Rev. Stat. § 28-518(1) (Reissue 2016).

[34] See Neb. Rev. Stat. § 28-1212.03 (Reissue 2016).

[35] See *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017).

to distribute this amount of methamphetamine constitutes a Class IB felony.[36]

The fact that the truck was stopped so that police could ask the motorist for information about a recent burglary and the presence of stolen property and narcotics weighs against the conclusion that the stop was constitutionally unreasonable.[37]

We conclude that the circumstances here involved ongoing criminal activity which presented a grave public concern.

### Degree to Which Seizure Advances Public Interest

As to the second factor of the *Brown* test, a court should consider the degree to which the seizure advances the public interest. Courts have recognized that motorist stops may significantly advance the investigation of serious crimes in cases where motorists are stopped soon after the crime and in the vicinity where the crime occurred.[38] The investigative value of such a stop is significant, because the stopped motorists "might well have been in the vicinity of the crime at the time it occurred."[39]

At the time, the officers were preparing to execute a search warrant on the target residence. Vrbka and Winkler first identified the location of the house with assistance from the informant, who stated that the resident of the house was the owner of the Volkswagen parked at the residence and that he had witnessed the resident sell $3,000 worth of methamphetamine 5 days prior. He said that the resident had more to sell and that officers could also find the gun safe in the living room hidden under a blanket.

When the task force first identified the residence, the truck was not present. A short time later, when Schilmoeller arrived

---

[36] See Neb. Rev. Stat. § 28-416(1) and (10)(a) (Supp. 2015).

[37] See *State v. Gorneault*, 918 A.2d 1207 (Me. 2007).

[38] *State v. LaPlante*, 26 A.3d 337 (Me. 2011).

[39] *Lidster, supra* note 7, 540 U.S. at 427.

on scene, he observed the unoccupied truck parked next to the Volkswagen. Thereafter, the target address was under police surveillance without interruption for 20 to 30 minutes until Schilmoeller saw the truck leave. Given the highly specific location of the truck, parked next to a small building suspected of containing narcotics and stolen firearms, and parked next to the suspect's vehicle on an offstreet driveway, the officers were reasonable to infer that Sievers had just been inside the residence and had made contact with the resident and that therefore, he could have information pertinent to the investigation.

The officers' testimony made clear they were faced with a dynamic situation in which drugs or firearms could soon be moved before the imminent acquisition and execution of a search warrant. Shortly before the stop, Winkler set up surveillance units in order to prevent the movement of stolen property. The stop was made pursuant to the specific information-seeking purpose of determining whether the lone vehicle observed leaving the residence contained property sought in the investigation.

Both the stop and ensuing investigation were diligently carried out. The reasonableness of the stop is supported by the presence of stolen firearms and other property; the use of the stolen property to purchase methamphetamine; the large store of methamphetamine at the target address, which to the officers' knowledge had not yet been moved or destroyed; and the short period in which the felonies were occurring. Society's legitimate interests required the seizure based on special law enforcement concerns of specific, known, ongoing crimes, as opposed to a general interest in crime control.

This conclusion is further supported by the U.S. Supreme Court's decision in *Illinois v. McArthur*,[40] which found lawful a temporary detention made near a house suspected of criminal

---

[40] *Illinois v. McArthur*, 531 U.S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001).

activity while officers were seeking a search warrant for the house. The Court found the temporary detention was tailored to the need of ensuring against the destruction of evidence in the house and was properly limited in time and scope. The Court said that the warrantless seizure was not per se unreasonable, because it involved a specially pressing or urgent law enforcement need, and that because the law enforcement concerns outweighed the individual privacy concerns, the stop was lawful.[41] The Court explained it had "upheld temporary restraints where needed to preserve evidence until police could obtain a warrant" and noted it had found no case in which it had "held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."[42]

Here, the information-seeking stop of Sievers was limited in time and scope based on the task force's "pre-warrant investigation" of the residence and tailored to the need to ensure against the loss of stolen properly while police obtained a search warrant for the residence.

Based on the circumstances here, we conclude the stop advanced the public interest.

SEVERITY OF INTERFERENCE
WITH INDIVIDUAL LIBERTY

As to the last factor, we recognize the stop of Sievers restrained his liberty. Hubka activated his police cruiser's emergency lights to pull over Sievers while Sievers was operating his truck. Sievers' stop was more likely to cause alarm or anxiety than a roadblock, because upcoming roadblocks are clearly visible and Sievers did not have advanced notice that he would be stopped.[43] We reiterate, however, this fact

---

[41] *Id.*

[42] *Id.*, 531 U.S. at 334.

[43] See *LaPlante, supra* note 38.

does not render the stop per se unreasonable. "The Fourth Amendment does not treat a motorist's car as his castle."[44] In *Lidster*, the Court found the stop of a vehicle along a public road was no greater of an intrusion than an officer who approaches a person on the street to question the individual. The Court said the stop

> [a]nd the resulting voluntary questioning of a motorist is as likely to prove important for police investigation as is the questioning of a pedestrian. Given these considerations, it would seem anomalous were the law (1) ordinarily to allow police freely to seek the voluntary cooperation of pedestrians but (2) ordinarily to forbid police to seek similar voluntary cooperation from motorists.[45]

The balance under *Brown v. Texas* is between the public interest and an individual's right to personal security free from "'arbitrary interference by law officers.'"[46] The test is grounded in the reasonableness of the official conduct and the presence of limitations on official discretion. In this case, it is undisputed that the officers had established probable cause that felonies were occurring at the residence. Such determination was based on specific, objective facts provided by the informant and police surveillance, "indicating that society's legitimate interests require[d] the seizure of the particular individual."[47]

The "mission" of the stop was limited in scope. The stop was focused on gathering information about the presence of drugs and specific stolen property, and as the stop of the truck ensued, it almost immediately yielded further evidence of criminal conduct. Hubka testified that as he approached the truck, he observed Sievers' making furtive movements consistent with hiding evidence or reaching for a

---

[44] *Lidster, supra* note 7, 540 U.S. at 424.

[45] *Id.*, 540 U.S. at 426.

[46] *Brown, supra* note 17, 443 U.S. at 50.

[47] See *id.*, 443 U.S. at 51.

weapon. Deliberately furtive actions are a strong indication of mens rea.[48]

As noted, the sole issue presented is the reasonableness of the initial stop. The fact that the officers were "extra assertive" when they contacted Sievers is not probative of the reasonableness of the initial stop, because the stop of the vehicle disclosed other reasons to escalate the detention of Sievers.[49]

There is no indication the officers did anything other than pursue a plan tailored to seeking information of ongoing crimes at the residence to be searched. The stop was a direct effort to temporarily maintain the status quo so that evidence of stolen property and narcotics at the target address could be preserved while officers concluded the final steps to obtain and execute a search warrant.

### Balancing *Brown* Factors

In balancing the *Brown* factors, on our de novo review, we find that Sievers was lawfully stopped. Officers sought to temporarily stop and question the driver of the truck for the purpose of investigating specific and known felonies, as well as the presence of narcotics and firearms. The grave public concern at issue heavily weighs in favor of the reasonableness of the stop.

The stop of Sievers to see if he had any information about the target residence or stolen property advanced the task force's investigation. Police knew Sievers' truck had just arrived at the target address and was parked in the driveway to the outbuilding, behind a primary residence, next to a vehicle owned by a suspected dealer of methamphetamine. After surveilling the scene without interruption for 20 to 30 minutes, the officers saw the truck moving from the residence. The

---

[48] See *Sibron v. New York*, 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968).

[49] See *U.S. v. Casares-Cardenas*, 14 F.3d 1283 (8th Cir. 1994).

officers were reasonable to conclude the driver of the truck had information to provide.

Finally, although the stop was an intrusion upon Sievers' liberty, the initial stop was not unnecessarily prolonged and the interference is not enough to counterbalance the officers' need to resolve grave and immediate threats to the public.

The critical mass of special law enforcement concerns presented in this case justifies the application of a rare exception to the rule against suspicionless searches and seizures. We do so only after ensuring that the officers' conduct was narrow in scope and that Sievers' privacy interests were not subject to arbitrary invasions at the unfettered discretion of officers in the field.

Although our reasoning differs from that of the district court, when all the factors are weighed, we conclude that the stop was reasonable under *Brown*.[50]

## CONCLUSION

Based on the foregoing reasons, we conclude the stop of Sievers was lawful. The judgment of the district court is affirmed.

AFFIRMED.

WRIGHT and FUNKE, JJ., not participating.

---

[50] *Brown, supra* note 17.